1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**
                         **DISTRICT OF NEVADA**
7

8

9   ALFONSO JACKSON,                    )       3:10-cv-00771-LRH (WGC)
                                        )
10              Plaintiff,               )       **REPORT AND RECOMMENDATION**
                                        )       **OF U.S. MAGISTRATE JUDGE**
11        vs.                            )
                                        )
12   JOHN DOE, *et. al.*                  )
                                        )
13              Defendants.              )
    _____)
14
          This Report and Recommendation is made to the Honorable Larry R.  Hicks, United
15
    States District Judge. The action was referred to the undersigned Magistrate Judge pursuant
16
    to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is
17
    Defendants' Motion for Summary Judgment. (Doc. # 65.)[1] Plaintiff opposed (Doc. # 80) and
18
    Defendants have replied (Doc. # 82). Plaintiff also filed a Cross-Motion for Summary
19
    Judgment (Doc. # 81) which Defendants have opposed (Doc. # 84) and moved to strike (Doc.
20
    # 83).[2]
21
          After a thorough review, the court recommends that both Defendants' and Plaintiff's
22
    motions for summary judgment be denied.
23
                                **I. BACKGROUND**
24
          At all relevant times, Plaintiff Alfonso Jackson  was an inmate in custody of the Nevada
25
    Department of Corrections (NDOC). (Pl.'s Sec. Am. Compl. (Doc. # 12) at 1.) The events giving
26

27  _____

28        [1] Refers to court's docket number.

          [2]The court has denied the motion to strike in a concurrently issued order.

1  rise to this litigation took place while Plaintiff was housed at Ely State Prison (ESP). (*Id*.)

2  Plaintiff, a *pro se* litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id*.) Defendants are

3  Justin Chenault, Charles Kirchen, Reuben Ladja, Jason Marshall, and Tom Stubbs.[3]

4  (Doc. # 12 at 3-4.)

5          Plaintiff alleges that on December 10, 2009, he was in the infirmary for mental health

6  reasons when Defendants came to his cell. (Doc. # 12 at 5, 6.) A female officer had a video

7  camera, and a sergeant instructed Plaintiff to back away from the door. (*Id*.) Plaintiff alleges

8  that he complied, and complied when the sergeant ordered him to get on the ground face-down.

9  (*Id*.)  Plaintiff goes on to assert that defendants then began stomping him on the heard and

10  yelling for him to put his hands behind his back. (*Id*.) They continued to stomp his head for

11  about three minutes, splitting his left eyebrow and cracking a front tooth. (*Id*.) Plaintiff was

12  then cuffed and shackled and taken to another room where he was strapped down to a bed with

13  blood on his face for hours. (*Id*.  at 6-7, 8.) Later, on December 11, 2009, he was taken to the

14  doctor, who stitched his eyebrow. (*Id*. at 7-8.) Plaintiff claims that he suffers nightmares from

15  the attack and that it made his jaw pain and headaches from TMJ worse. (*Id*.  at 5, 6.) On

16  screening, the court determined the Plaintiff states a colorable claim for excessive force under

17  the Eighth Amendment.  (Screening Order (Doc. # 14) at 4.)

18          Defendants move for summary judgment, arguing: (1) they only used that amount of

19  force which was reasonable and necessary under the circumstances to stop the destruction of

20  property and to protect Plaintiff from himself; and (2) they are entitled to qualified immunity.

21  (Doc. # 65.)

22          Plaintiff opposes Defendants' motion, arguing that genuine issues of material fact exist

23  precluding summary judgment because he maintains that the force used by Defendants was

24  malicious and sadistic for the purpose of causing harm. (Doc. # 80.) At the same time, Plaintiff

25  has filed a Cross-Motion for Summary Judgment, arguing that there is no dispute as to any

26  _____

27          [3]Glinda Stroik, Joshua Conner, and James Minnix were dismissed without prejudice on June 29, 2012.
   (Doc. # 89.)

28

1  material fact regarding the use of excessive force; therefore, he is entitled to judgment as a

2  matter of law. (Doc. # 81 at 12-23.)

3                               **II.  LEGAL STANDARD**

4         "The purpose of summary judgment is to avoid unnecessary trials when there is no

5  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

6  18 F.3d 1468, 1471 (9th Cir.  1994) (citation omitted). All reasonable inferences are drawn in

7  favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir.  2008) (citing

8  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate

9  if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

10 there is no genuine issue as to any material fact and that the movant is entitled to judgment as

11 a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)). Where reasonable minds could differ on the

12 material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S.

13 at 250.

14        The moving party bears the burden of informing the court of the basis for its motion,

15 together with evidence demonstrating the absence of any genuine issue of material fact.

16 *Celotex Corp.  v.  Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence

17 in an inadmissible form, only evidence which might be admissible at trial may be considered

18 by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c).

19        In evaluating the appropriateness of summary judgment, three steps are necessary:

20 (1) determining whether a fact is material; (2) determining whether there is a genuine issue for

21 the trier of fact, as determined by the documents submitted to the court; and (3) considering

22 that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250.

23 As to materiality, only disputes over facts that might affect the outcome of the suit under the

24 governing law will properly preclude the entry of summary judgment; factual disputes which

25 are irrelevant or unnecessary will not be considered. *Id.*  at 248.

26        In determining summary judgment, a court applies a burden shifting analysis. "When

27 the party moving for summary judgment would bear the burden of proof at trial, 'it must come

28

                                          3

forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id.* Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not

1  significantly probative, summary judgment may be granted. *Id.* at 249-50, 255 (citations
2  omitted).

3  **III. DISCUSSION**

4  **A.  Excessive Force Standard**

5      The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S.
6  Const. amend. VIII.  It "embodies broad and idealistic concepts of dignity, civilized standards,
7  humanity, and decency." *Estelle v.  Gamble*, 429 U.S. 97, 102 (1976) (citation and internal
8  quotations omitted).  The "unnecessary and wanton infliction of pain…constitutes cruel and
9  unusual punishment forbidden by the Eighth Amendment." *Id.*  (quoting *Whitley v.  Albers*,
10  475 U.S. 312, 319 (1986).

11      "[W]henever prison officials stand accused of using excessive physical force in violation
12  of the [Eighth Amendment], the core judicial inquiry is…whether force was applied in a good-
13  faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."
14  *Hudson v.  McMillian*, 503 U.S. 1, 6-7 (1992); *see also Whitley*, 475 U.S. at 320-21; *Watts v.*
15  *McKinney*, 394 F.3d 710, 711 (9th Cir.  2005); *Martinez v.  Stanford*, 323 F.3d 1178, 1184 (9th
16  Cir.  2003).  "When prison officials maliciously and sadistically use force to cause harm,
17  contemporary standards of decency are always violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*,
18  475 U.S. at 327).

19      In determining whether the use of force is excessive, courts are instructed to examine
20  "the extent of the injury suffered by an inmate[,]" "the need for application of force, the
21  relationship between that need and the amount of force used, the threat 'reasonably perceived
22  by the responsible officials,' and 'any efforts made to temper the severity of the forceful
23  response.'" *Hudson*, 503 U.S.  at 7 (quoting *Whitley*, 475 U.S. at 321).

24      An inmate need not establish serious injury; however, the lack of serious injury is
25  relevant to the Eighth Amendment inquiry. *See Wilkins v. Gaddy*, 130 S.Ct. 1175, 1178 (2010).
26  "The extent of injury may [ ] provide some indication of the amount of force applied." *Id.*

27      That being said, not "every malevolent touch by a prison guard gives rise to a federal

28

1    cause of action…The Eighth Amendment's prohibition of 'cruel and unusual' punishments

2    necessarily excludes from constitutional recognition *de minimis* uses of physical force,

3    provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"

4    *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327); *see also Wilkins*, 130 S.Ct. 1178

5    ("An inmate who complains of a 'push or shove' that causes no discernible injury almost

6    certainly fails to state a valid excessive force claim." (citing *Hudson*, 503 U.S. at 9)).  "Injury

7    and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.

8    An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive

9    force claim merely because he has the good fortune to escape without serious injury." *Wilkins*,

10   130 S.Ct. at 1178-79.  If the nature of the injuries is more than *de minimis*, but still "relatively

11   modest," the inmate's damages will likely be limited.  *See id.* at 1180.

12       Courts must be deferential when reviewing the necessity of using force.  *See Whitley*, 475

13   U.S. at 321-22; *see also Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2009), *cert. denied*,

14   131 S.Ct. 1465 (Feb. 22, 2011) ("Prison officials are entitled to deference whether a prisoner

15   challenges excessive force or conditions of confinement." (citing *Whitley*, 475 U.S. at 322)).

16   **B.  Summary of Facts and Evidence**

17       In support of their motion, Defendants provide the declaration of Senior Correctional

18   Officer Michael Rowley, who is currently a member of ESP's Correctional Emergency Response

19   Team (CERT).  (Doc. # 65-2 at 12-15 ¶ 1 (Rowley Decl.).) According to Mr. Rowley, a cell

20   extraction may be performed when an inmate is endangering himself or others, or to prevent

21   the destruction of state property. (*Id.* ¶ 4.) Before the actual extraction occurs, an inmate will

22   be given several chances to voluntarily submit to restraints. (*Id.*) If these efforts fail, an

23   extraction team is assembled, dressed in protective gear. (*Id.* ¶¶ 5-6.) A capture shield is always

24   used in performing a cell extraction.  (*Id.* ¶ 6.)  The shield is used so that the extraction team

25   members can avoid objects thrown by inmates, and/or to secure an inmate against the bed,

26   floor, or wall, to allow the extraction team to secure the inmate's hands and feet. (*Id.* ¶ 7.)

27   When the team enters the cell for an extraction, the shield is used to pin the inmate, and then

28

efforts are made to secure the inmate's limbs. (*Id.* ¶ 11.) If the inmate refuses to allow his hands or arms to be restrained, the officers will try to pull the arms behind the inmate, and if this is unsuccessful, may have to engage in a struggle with the inmate. (*Id.* ¶ 12.) Once the inmate is restrained, the officers will walk with the inmate out of the cell to place him in a secure area. (*Id.* ¶ 13.) In the event an inmate is to be placed in an observation cell in the mental health unit, the team will place the inmate face down and secure him in soft restraints. (*Id.* ¶14.) The inmate's clothing is cut off so he cannot harm himself. (*Id.*) Once in the soft restraints, medical staff will examine the inmate for injuries and provide any necessary treatment. (*Id.* ¶ 15.) Medical staff will also check to make sure the soft restraints are not too tight. (*Id.*)

Defendant Kirchen was employed by NDOC at ESP as a correctional sergeant, and on December 10, 2009, was attending to his duties when he was informed that Plaintiff was tearing up the flooring in his cell. (Doc. # 65-2 ¶¶ 1, 4 (Kirchen Decl.).) He went to Plaintiff's cell with CNA Rosalind Harwell and Lieutenant James Minnix. (*Id.* ¶ 4.) He observed that Plaintiff had torn up pieces of the floor and was washing them in the sink in his cell. (*Id.*) According to defendant Kirchen, Lieutenant Minnix ordered Plaintiff to submit to restraints, to no avail. (*Id.* ¶ 5.) As a result, a cell extraction team was assembled, and defendant Kirchen began preparing a soft cell for Plaintiff. (*Id.*) Defendant Kirchen did not take part in or observe the cell extraction as he was still preparing the soft cell for Plaintiff, but overheard Lieutenant Minnix order Plaintiff to stop resisting. (*Id.* ¶ 6.) Plaintiff was eventually transported to the soft cell and placed in soft restraints. (*Id.* ¶ 7.) Defendant Kirchen observed Plaintiff receive treatment from medical staff for his facial injuries. (*Id.*) Defendant Kirchen maintains that he never kicked or punched Plaintiff and did not observe any member of the cell extraction team engage in such conduct. (*Id.* ¶ 8.)

Defendant Chenault was employed by NDOC at ESP as a correctional officer, and on the date of the incident, was assigned to work as a floor officer. (Doc. # 65-2 at 6 ¶¶ 1, 4 (Chenault Decl.).) He was part of the cell extraction team assembled to remove Plaintiff from his cell. (*Id.* ¶ 4.) He was responsible for securing Plaintiff's upper body. (*Id.* ¶ 5.) According to defendant

7

1   Chenault, the team arrived at Plaintiff's cell and he refused to submit to restraints. (*Id.* ¶ 6.)
2   As a result, the team entered Plaintiff's cell and a shield was used to secure Plaintiff against the
3   floor. (*Id.* ¶ 7.) Plaintiff resisted in having his wrists restrained, but the team was ultimately
4   able to restrain them. (*Id.*) Defendant Chenault maintains that at no time during the extraction
5   did he kick or punch Plaintiff. (*Id.* ¶ 8.) Nor did he observe any other member of the team
6   engage in this conduct. (*Id.*) After the extraction, Plaintiff was taken into another cell and
7   placed in soft restraints, and was attended by medical staff. (*Id.* ¶ 9.)

8        On the date of the incident, defendant Lajda was employed by NDOC at ESP as a
9   correctional officer and was assigned to work as a floor officer. (Doc. # 65-1 ¶¶ 1, 4 (Lajda
10  Decl.).) He was called to the infirmary for a planned use of force to extract Plaintiff from his
11  cell. (*Id.* ¶ 5.) His duty was to secure Plaintiff's legs. (*Id.* ¶ 6.) According to defendant Lajda,
12  Plaintiff refused to comply with orders to be restrained; therefore, the team entered to forcibly
13  extract him. (*Id.* ¶ 7.) Defendant Lajda secured Plaintiff's legs, and Plaintiff was taken to a soft
14  cell and placed in soft restraints. (*Id.*) Defendant Lajda maintains that he did not intentionally
15  kick or punch Plaintiff and did not observe such activity by any other member of the cell
16  extraction team. (*Id.*)

17       Defendant Stubbs was employed by NDOC at ESP as a senior correctional officer, and
18  on the date of the incident was assigned to a team for a planned use of force to extract Plaintiff
19  from his cell. (Doc. # 65-2 at 8 ¶¶ 1, 4 (Stubbs Decl.).) Defendant Stubbs was assigned to the
20  shield and was to be the first person to enter into Plaintiff's cell. (*Id.* ¶ 4.) According to
21  defendant Stubbs, when the team arrived at Plaintiff's cell, he refused to comply with orders
22  to submit to restraints, and as a result, the team moved into his cell. (*Id.* ¶ 5.) Defendant Stubbs
23  used the shield to secure Plaintiff against a wall in the cell, and then Plaintiff went to the
24  ground, and defendant Stubbs helped to secure his arms. (*Id.* ¶ 6.) Plaintiff would not allow
25  his left arm to be restrained, resulting in a struggle wherein defendant Stubbs had to pull on
26  Plaintiff's left arm multiple times as Plaintiff refused repeated orders to stop resisting. (*Id.*)
27  Eventually, defendant Stubbs was able to secure Plaintiff's arm behind his back. (*Id.*)

28

1    Defendant Stubbs claims that he did so with the least amount of force necessary to secure

2    Plaintiff.  (*Id*.) Once secure, Plaintiff was taken to a soft cell and placed in soft restraints. (*Id*.

3    ¶ 7.) Defendant Stubbs maintains that he never intentionally kicked or punched Plaintiff, and

4    did not observe such conduct on behalf of any extraction team member. (*Id*.  ¶ 8.) Defendant

5    Stubbs observed that Plaintiff was attended to by medical staff and then left the cell. (*Id*.  ¶ 9.)

6        Defendant Marshall was also employed as a correctional officer at ESP, and on

7    December 10, 2009, was assigned to the extraction team to remove Plaintiff from his cell.

8    (Doc. # 65-3 at 10 ¶¶ 1, 4 (Marshall Decl.).) He was assigned to secure Plaintiff's legs. (*Id*.  ¶ 4.)

9    Like the other defendants assigned to the extraction team, defendant Marshall asserts that

10   Plaintiff refused to comply with orders to submit to restraints, resulting in the team entering

11   his cell. (*Id*.  ¶ 5.) Once in Plaintiff's cell, a shield was used to secure Plaintiff against the wall;

12   however, Plaintiff went onto the floor. (*Id*.  ¶¶ 5-6.) Plaintiff refused repeated requests to

13   submit his left hand to restraints. (*Id*.  ¶ 6.) Defendant Marshall helped to secure Plaintiff's

14   legs, and once the team had restrained Plaintiff, he was taken to a soft cell and placed in soft

15   restraints. (*Id*. ¶ 7.) Defendant Marshall maintains that he never intentionally kicked or

16   punched Plaintiff, and did not observe any other member of the team do so. (*Id*. ¶ 8.)

17       In support of their motion, Defendants have submitted portions of Plaintiff's medical

18   records, including progress notes and physicians orders from October 14, 2009 through

19   January, 2010, and Plaintiff's Unusual Occurrence Reports from January 7, 2008 through

20   February 18, 2010.  (*See* Doc. # 65-1 at 2-6 (Lowery Decl.); Doc. # 67 (Ex. A).)  The relevant

21   portions of Plaintiff's medical records are summarized below.

22       On December 3, 2009, Plaintiff was seen by Dr.  Koehn requesting Tylenol for his sore

23   jaw. (Doc. # 67 at 10.)  He is noted as having a prior diagnosis of TMJ secondary to a traumatic

24   injury.  (*Id*.) He was examined and prescribed Tylenol. (*Id*.)

25       The progress notes entry for December 10, 2009, the date of the subject instant,

26   references the Unusual Occurrence Report for that date. (Doc. # 67 at 10.)

27       The Unusual Occurrence Report for December 10, 2009, contains the following

28

1    subjective notes attributed to Plaintiff: "I didn't resist. Y'all don't know who you're messin'
2    with. I don't know why you had to mess me up." (Doc. # 67 at 14.) In addition, it contains the
3    following objective notes: "Inmate evaluated in cell 9A18 post spontaneous use of force.
4    Inmate has 2 shallow and one deep laceration above left eye. Deep laceration approximately
5    1/2 inch deep and 3/4 inch in length. Shallow lacerations approximately 1/8 inch in depth and
6    1/2 inch in length. No further injuries noted." (*Id*.) Plaintiff was assessed as having his skin
7    integrity impaired. (*Id*.) The wound sites were cleansed with sterile water and secured with
8    steri-strips, and Plaintiff was instructed to follow up with his provider for possible sutures.
9    (*Id*.)

10       Physicians orders from December 10, 2009, indicate that Plaintiff was prescribed 20 mg
11   of Geodon, and was ordered to be placed in five point restraints for four hours, and an
12   additional four hours, if necessary. (Doc. # 67 at 9.)

13       On December 11, 2009, it was noted that Plaintiff was released from the five point
14   restraints and was calm and cooperative, with no further complaints. (Doc. # 67 at 10.) On the
15   same date, Plaintiff was seen by Dr. Koehn following a physical altercation with guards. (Doc.
16   # 67 at 11.) Dr. Koehn noted that Plaintiff had a laceration over his left eye, approximately one
17   inch deep and one and a half inches long. (*Id*.) A repair of the laceration was conducted, which
18   included sutures. (*Id*.)

19       Defendants also submit the video recording of the incident in support of their motion.
20   (Doc. # 65 Ex. B (submitted in chambers).) The court has reviewed the video.

21       Plaintiff submits his own declaration in support of his opposition to Defendants' motion,
22   and in support of his Cross-motion for Summary Judgment. (*See* Doc. # 80 at 4-17 (Jackson
23   Decl.).)

24       Plaintiff claims that the amount of force used by Defendants was unnecessary and
25   excessive in order to accomplish the goal of placing Plaintiff in restraints and completing the
26   cell extraction. (Docs. # 80, # 81 at 5, 19.) Plaintiff asserts that the circumstances did not even
27   justify a cell extraction, because Plaintiff was not destroying state property, and when
28

10

Defendants approached his cell, he was mumbling to himself, but was calm and was not acting in an aggressive or threatening manner. (*Id.* at 7, 15.)

Plaintiff also claims that the actual use of force was not justified. (Docs. # 80, # 81 at 6, 7.) Instead, Plaintiff claims that when Defendants charged into his cell, he had his arms folded across his chest, and was taken to the ground by Defendants. (*Id.* at 8, 13.) He asserts that he was not given time to comply with Lieutenant Minnix's order to submit to restraints before Defendants came rushing into his cell. (*Id.* at 8, 14.) Once on the ground, Plaintiff disputes that he resisted Defendants efforts to restrain him. (*Id.*) He claims that when he was on the ground, one of the Defendants grabbed Plaintiff's leg and held it in the air while the other Defendants were punching Plaintiff in the face and pounding his head against the ground. (*Id.*) Plaintiff contends that he yelled out, "they are hitting me in the face. They are trying to kill me." (*Id.*) In addition, Plaintiff asserts that Lieutenant Minnix intentionally blocked the view of the camera from seeing Defendants punch Plaintiff. (*Id.* at 14.)

With respect to his injuries, Plaintiff claims that Defendants caused him to suffer from lacerations above his left eye and lip. (Docs. # 80, # 81 at 9.) He also asserts that Defendants' action of repeatedly pounding his face into the ground caused his front tooth to crack, which resulted in a worsening of his TMJ condition, and caused him to experience nightmares and mental and emotional distress. (*Id.* at 9, 15.) Plaintiff disputes the assertions contained within Defendants' declarations, and maintains that they did punch his face and stomp his head. (*Id.* at 11.) Once Plaintiff was moved into the soft restraint room, he asserts that he said to the officers, "Y'all didn't have to mess up my face like that." (*Id.* at 16.)

**C. Summary of Argument**

Defendants argue that the evidence demonstrates that the amount of force used was necessary under the circumstances, to stop the destruction of property and protect Plaintiff from himself. (Doc. # 65 at 4.)

Plaintiff argues that he disputes nearly all of the facts asserted by Defendants, and maintains that Defendants use of force was unreasonable and excessive under the

circumstances. (Doc. # 80 at 1-12.) At the same time, Plaintiff argues that he is entitled to summary judgment because there is no dispute as to a material fact. (Doc. # 81 at 12-23.)

**D. Analysis**

The court finds that genuine issues of material fact exist as to whether the force applied to Plaintiff on December 10, 2009, was in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm. *See Hudson*, 503 U.S. at 6-7. This precludes the granting of summary judgment on behalf of Defendants or Plaintiff.

Plaintiff has raised genuine issues of material fact as to the need for the application of force, the amount of force used, and the relationship between these elements. First, while Defendants contend that they used the amount of force that was necessary to prevent the destruction of property and prevent Plaintiff from injuring himself, Plaintiff maintains that he was not responsible for the damage to the cell flooring, and that he presented no danger to himself or others when Defendants approached his cell.

Next, Defendants claim that it was necessary to use force because Plaintiff refused to submit to restraints, but Plaintiff maintains that when Defendants approached his cell and Lieutenant Minnix gave him an order to submit to restraints, he was given virtually no time to comply with the order before the cell extraction team rushed into his cell and pinned him to the ground. Likewise, while Defendants assert that a struggle ensued because Plaintiff would not allow his left arm to be restrained, Plaintiff states that he did not resist, and instead, one of the officers held his leg in the air while the others punched and stomped him. Defendants dispute that Plaintiff was intentionally punched or kicked. The video recording of the incident simply reinforces the court's finding that genuine issues of material fact exist as to whether excessive force was applied to Plaintiff. (*See* Doc. # 65 Ex. B.) Most of the footage of the actual use of force is blocked from the viewer because one or more of the officers is standing in the way of the video camera, precluding the viewer from determining exactly what happened.

Finally, while Defendants assert that Plaintiff merely suffered from a few superficial lacerations, Plaintiff maintains that his injuries were much more serious than that. Plaintiff's

1    medical records confirm that he did have to receive sutures for one of the lacerations received

2    as a result of the scuffle.

3         Given the existence of these genuine issues of material fact, Defendants' and Plaintiff's

4    motions for summary judgment should be denied.

5    **E.  Qualified Immunity**

6         Defendants argue that they are entitled to qualified immunity because a reasonable

7    correctional officer would not have believed the force used was excessive. (Doc. # 65 at 5-6.)

8         "Qualified immunity shields federal and state officials from money damages unless a

9    plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

10   (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v.*

11   *al-Kidd*, 131 S.Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982);

12   *see also Padilla v. Yoo* (9th Cir. 2012); *Pearson v. Callahan*, 555 U.S. 223 (2009).

13        A "[g]overnment official's conduct violates clearly established law when, at the time of

14   the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every

15   'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*,

16   131 S.Ct. at 2083 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640

17   (1987)); *see also Padilla v. Yoo* (9th Cir. 2012). "We do not require a case directly on point, but

18   existing precedent must have placed the statutory or constitutional question beyond debate."

19   *Id*. "Qualified immunity gives government officials breathing room to make reasonable but

20   mistaken judgments about open legal questions," and courts are "not to define clearly

21   established law at a high level of generality[.]" *Id*. at 2084-85; *see also Dunn v. Castro*, 621

22   F.3d 1196, 1201 (9th Cir. 2010) ("[T]he right allegedly violated must be defined at the

23   appropriate level of specificity before a court can determine if it was clearly established.").

24        Whether a constitutional right was violated and whether the right was clearly established

25   at the time of the violation are legal questions for the court. *See Serrano v. Francis*, 345 F.3d

26   1071, 1080 (9th Cir. 2003); *Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003).

27   However, "[i]f a genuine issue of material fact exists that prevents a determination of qualified

28

1  immunity at summary judgment, the case must proceed to trial." *Serrano*, 345 F.3d at 1077.

2       The court determined that Plaintiff has alleged a colorable claim for excessive force

3  under the Eighth Amendment. Therefore, the only remaining question under qualified

4  immunity is whether the law regarding excessive force was sufficiently clear on December 10,

5  2009. Whether or not the force applied in this instance was excessive is a question for the jury.

6  Notwithstanding the existence of material factual issues, the court finds there is no doubt that

7  on December 10, 2009, the law was clear that when force is used in a malicious and sadistic

8  manner to cause harm, and not in a good-faith effort to maintain or restore discipline, the

9  constitution is violated. *See Hudson*, 503 U.S. at 6-7, 9. As a result, the court finds Defendants

10  are not entitled to qualified immunity.

11

12                              **IV. RECOMMENDATION**

13       **IT IS HEREBY RECOMMENDED** that the District Judge enter an order that

14  Defendants' Motion for Summary Judgment (Doc. # 65) and Plaintiff's Cross-Motion for

15  Summary Judgment (Doc. # 81) be **DENIED**.

16       The parties should be aware of the following:

17       1.       That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the

18  Local Rules of Practice, specific written objections to this Report and Recommendation within

19  fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate

20  Judge's Report and Recommendation" and should be accompanied by points and authorities

21  for consideration by the District Court.

22       2.       That this Report and Recommendation is not an appealable order and that any

23  notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the

24  District Court's judgment.

25       DATED: July 5, 2012.

26  _____
    WILLIAM G.  COBB
27  UNITED STATES MAGISTRATE JUDGE

28

                                    14